UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

HEALTH CARE SERVICES
CORPORATION,

    **Plaintiff,**

    v.                                                              CIV. NO. 09-1213 ACT/LFG

**SOUTHWEST TRANE and
PETERSON WATER TREATMENT,**

    **Defendants,**

    **and**

**AMERICAN HALLMARK INSURANCE
COMPANY OF TEXAS,**

    **Plaintiff-in-Intervention,**

    v.

**PETERSON WATER TREATMENT,**

    **Defendant-in-Intervention.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Peterson Water Treatment's ("Peterson") Motion for Partial Summary Judgment [Doc. 81] filed September 23, 2010. Health Care Services Corporation ("HCSC") filed a response [Doc. 86] on October 12, 2010, and Peterson filed a reply [Doc. 89] on October 20, 2010. The Court having reviewed the pleadings and the relevant law finds that Peterson's Motion is well taken and will be granted.

HCSC filed a Complaint on December 20, 2009, asserting a claim of negligence against Peterson. On or about July 2, 2008, after an inspection of HCSC's cooling towers, Southwest Trane ("Trane") , who installed and serviced the units, recommended that the scale buildup on the cooling

towers RTU-1 and RTU-2 be removed.  Peterson was hired to clean the cooling towers.  The cleaning which consisted of an acid wash was done between July 11-13, 2008.  On July 13, 2008, Peterson discovered that one of the units, RTU-2, shut down.  The other cooling unit, RTU-1, continued in operation after Peterson performed the acid wash.  Thus, Peterson argues, HCSC did not incur damages as to RTU-1.

   Undisputed facts.

The following material facts are undisputed.  The copper coils in the evaporative condenser of RTU-1 and RTU-2 began developing a coating of silica which compromised the units' efficiency.  In July of 2008, Trane recommended that the copper tubing in the evaporative condenser section of RTU-1 and RTU-2 be cleaned to remove the scale build-up.  After Trane made the recommendation to clean the copper tubing, Peterson agreed to perform an acid wash treatment to the copper condenser coils.  Peterson's cleaning of the RTUs, including RTU-1, began on July 11, 2008.  Peterson's acid wash treatment on RTU-1 ended on July 13, 2008.  RTU-1 continued in operation after Peterson's acid wash treatment.

   On August 4, 2010, HCSC's expert, Robert Keith O'Neil ("O'Neil"), testified:

   Q.   Were you involved in any decision to replace RTU 1?
   A.   Coil?
   Q.   Right.
   A.   No.
   Q.   Were you aware that FM Global denied the claim by Blue Cross/Blue Shield to replace RTU 1?
   A.   Coil?
   Q.   Coil, yeah.  Thanks for clarifyng.
   A.   Yes, I was aware they had denied it.
   Q.   Did you recommend that denial?
   A.   I provided information that the coil could not be determined to be compromised.
   Q.   And so I should ask a little fair question, too.  I know you're not recommending denials, but you're providing expertise to the insurance company to make decisions on.
   A.   Yes.

> Q. And is it fair to say, then, that you expressed the opinion that there was no evidence that RTU 1 had been compromised, and so therefore, it didn't necessitate repair or replacement based on any copper corrosion?
> ...
> A. That's fair to say.

[Doc. 81, Exh. 4 at 78-79.]

On August 6, 2010, HCSC's expert, Joseph P. Crosson ("Crosson"), P.E. testified:

> Q. Did you find evidence of any penetration in the three samples of RTU 1tubing provided to you?
> A. No.

[Doc. 81, Exh. 5, p. 35.]

> ...
>
> Q. Will you express any opinion in this case that the RTU 1 evaporative condenser coils needed to be replaced?
> A. My opinion with respect to RTU 1, is that as stated in the report, that the three sections from the RTU 1 only exhibited superficial corrosion attack.
> Q. And I'm taking the conclusion from that, do you have an opinion as to whether or not because there was only superficial attack, whether that evaporative condenser coil needed to be replaced?
> A. If those three tubes were representative of the entire condition of the tubing, then it could have remained in service.

*Id.* at 38-39.

> ...
>
> Q. What does Figure 9 show?
> A. Nine is a higher magnification photograph of the tube from – one of the tube sections from RTU 1. And shows the general microstructure of the material and shows that there is no corrosion, no significant corrosion penetration.
> Q. And the top portion would be the outer diameter?
> A. Yes.
> Q. And just from my observation, they look essentially the same, outer and inner diameter surfaces, do they to you?
> A. Yes, there is just a slight etching of the outer surface.
> Q. At 100X, is what we're looking at here, right?
> A. Yes.
> Q. And to your knowledge, no acid ever entered the interior of these tubes?

      A.      To my knowledge, yes.

*Id.* at 46.

      A HCSC spreadsheet shows that HCSC replaced the RTU-1 unit for a cost of $98,477.83. The spreadsheet shows that the invoice for the replacement was dated April 17, 2009. [Doc. 81, Exh. 6.]

      <u>Legal standard</u>.

      Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).

      The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. at 323. Once the movant meets this burden, Rule 56(e) requires the non-moving party to designate specific facts that would be admissible in evidence showing that there is a genuine issue for trial. *Id.* at 324. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable...or is not significantly probative,...summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec.*

*Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When jurisdiction in federal court is based upon diversity of citizenship, the Court applies the substantive law of the forum state. *Beardsley v. Farmland Co-Op, Inc.*, 530 F.3d 1309, 1313 (10th Cir. 2008). In New Mexico, a negligence claim requires the following elements: (1) a duty of the defendant to the plaintiff, (2) a breach of that duty, and (3) a showing that the breach of duty is the proximate cause and cause in fact of plaintiff's damages. *Herrera v. Quality Pontiac*, 2003-NMSC-18, ¶6, 134 N.M. 43,47-48, 73 P.3d 181, 185-86. "[T]here can be no cause of action for negligence unless and until there has been a resulting injury." *N.M. Pub. Schools Ins. Authority. Arthur J. Gallagher & Co.*, 2008-NMSC-067, ¶36, 145 N.M. 316.

Legal analysis.

As outlined in the undisputed material facts, HCSC's cooling units had severe scaling and Trane recommended that the copper tubing in the evaporative condenser section be cleaned. Peterson performed the acid wash procedure on the two RTUs between July 11, 2008 and July 13, 2008. After the cleaning, RTU-1 remained in operation. It is not clear from the briefs as to the precise date that RTU-1 was replaced. However, it is clear that the replacement was many months after the cleaning. The evidence before the Court reflects an invoice for the replacement dated April 17, 2009. [Doc. 81, Exh. 6.]

In its response, HCSC did not dispute Peterson's facts. Rather, HCSC asserted additional material facts. The additional material facts are that there was evidence of "damage" to RTU-1 after the cleaning and that there was scaling on the RTU-1 prior to the cleaning. These facts do not establish that the replacement months after the cleaning was because of Peterson's acid wash. The undisputed material facts before the Court are that HCSC's experts testified that any damage resulting from the acid wash cleaning did not affect the operation of RTU-1 and that RTU-1

remained operational for months after the acid wash. As to the scaling, there is no evidence that any scaling left after the acid wash was caused by Peterson's treatment. As discussed below, these additional material facts do not raise genuine issues of material fact and thus do not preclude summary judgment.

HCSC asserts in additional material fact No. 1 that Erick Fritz, Peterson's employee who conducted the acid cleaning, testified that after the cleaning he "visually inspected tower [RTU] 1 and saw more scale removal from the unit but also saw some copper corrosion." [Doc. 86 at 4.] In additional material fact No. 2, HCSC refers to a memo from PureWaterSolutions to Liz Carrillo of HCSC dated September 14, 2008, which states that copper corrosion was evident on the copper components of RTU-1 after the acid cleaning.[1] *Id.*

The Court agrees with Peterson that these additional facts are not material. Even if true, it is undisputed that RTU-1 remained in service for many months after the acid cleaning. Furthermore, HCSC's own experts testified that RTU-1 could have remained in service. O'Neil testified that there was no evidence of penetration in RTU-1 and therefore repair and replacement were not necessary. [Doc. 81, Exh. 4.] Crosson, HCSC's metallurgist expert, testified that the copper tubing was not compromised and that RTU-1 could have remained in service. *Id.* at Exh. 5. Thus, it is undisputed by HCSC's own experts that the acid cleaning did not render RTU-1 inoperable. Crosson further states in his report that the tubes in RTU-1 had not leaked and that the tubes in RTU-1 did not exhibit significant damage. [Doc. 86 at Exh. E.]

---

[1] The PureWaterSolutions report also states that "[c]onsiderable amounts of the deposit are coming off in 'sheets' on RTU-1. This is due to thermal expansion and contraction [of] the tubes. This is a good event. The photos I sent you show fairly clean tubes on RTU-1." Thus, though the report says that the color on the tubes of RTU-1 indicate copper corrosion, the tubes are "fairly clean." [Doc. 86 at Exh. C.] As discussed in this opinion, the evidence before the Court, including the report by PureWaterSolutions, does not provide any facts as to the effect of the copper corrosion on RTU-1. To the contrary, this report indicates that the copper corrosion had no negative effect on RTU-1.

HCSC alleges in additional material fact No. 3 that a material issue of fact exists because O'Neil states in his 2008 report that "the condenser tubes in RTU 1 were not compromised to the extent of RTU 2. The acid solution was not concentrated in RTU 1 according to information provided. This would explain why RTU 1 did not suffer a complete penetration of its condenser tubing, however the condition of the condenser tubes has not been determined." *Id.* at 4. HCSC's reliance on this statement is misplaced. This statement does not refute that RTU-1 suffered no penetration and that RTU-1 remained operational. In addition, O'Neil also states in his report that "[a] visual inspection was performed by Peterson Water Treatment and Trane on Sunday evening July 13, 2008 but was not thorough. Tube wall integrity can only be determined using devices that can measure mass loss. This has not been performed." *Id.* at Exh. D. Thus, O'Neil's report does not provide any facts or evidence of any damage to RTU-1 after the acid wash that would have necessitated its repair or replacement.

In additional material facts Nos. 4 and 5, HCSC also relies on the testimony of their expert, Crosson. HCSC alleges that Crosson's statement that "[t]he tubes in RTU 1 apparently had not sustained damage to the same extent and had not leaked" raises a material fact that disputes Peterson's assertion that there was no injury to RTU-1. Again, HCSC's reliance in this statement is misplaced; it is a mere conclusory statement. Crosson's statement does not refute the undisputed fact that RTU-1 remained in operation after the acid cleaning. HCSC has not submitted into evidence any facts which support its assertion that because of Peterson's cleaning, RTU-1 had to be replaced. It has merely submitted into evidence testimony that there was some exterior damage to RTU-1. However, in light of their own experts' testimony, this is not material. The evidence concerning damage to RTU-1 is that the damage did not require that RTU-1 be repaired or replaced and that it could and did remain in operation. Similarly, HCSC's reliance on other testimony by

Crosson as to why RTU-2 failed and RTU-1 did not is not material. Furthermore, a portion of Crosson's report that HCSC did not cite to the Court supports Peterson's argument that RTU-1 was not injured by the acid wash:

> "The tubes in RTU 1 apparently had not sustained damages to the same extent [as to RTU 2] and had not leaked." [Doc. 86, Exh. E at LP-CROSSON 000010.]
>
> "The tubes in RTU 1 do not exhibit significant damage." *Id*. at LP-CROSSON 000011.
>
> "The microspecimens through the tube sections from RTU 1 did not exhibit any significant corrosion attack, as shown in Fig. 9." *Id*. at LP-CROSSON 000011-12.

HCSC's additional material facts Nos. 6,7,8, and 9 assert that there was scale buildup on RTU-2 before and after Peterson's acid wash. [Doc. 86 at 6-7.] This is undisputed. However, the fact that there was scale build up prior to and after Peterson's acid wash is not material to the issue before the Court. The issue before the Court is whether Peterson's acid wash damaged RTU-1 such that repair or replacement was necessary. HCSC relies on the fact that O'Neil testified that cooling units may last from ten to twenty years. However, there is no evidence that Peterson's acid wash shortened RTU-1's useful life. HCSC has submitted no evidence as to the reason for the replacement of RTU-1 months after the cleaning by Peterson. *Sandoval v. Baker Hughes Oilfield Ops., Inc*., 146 N.M. 853, 860, 215 P.3d 791, 798 (Ct. App. 2009) ("A party seeking to recover damages has the burden of proving the existence of injuries and resulting damage with reasonable certainty.")

Finally, HCSC appears to claim it is entitled to damages because of the corrosion "damage" to RTU-1. There are no facts or testimony before the Court that the corrosion "damage" after the acid wash was the cause of the replacement of the RTU-1 unit many months later. There are no facts or evidence before the Court as to the efficiency of RTU-1 after the acid wash. The undisputed evidence before the Court is that the copper corrosion did not make RTU-1 inoperable or require its

repair or replacement.

**IT IS THEREFORE ORDERED** that Defendant Peterson Water Treatment's Motion for Partial Summary Judgment is granted.

**IT IS FURTHER ORDERED** that all claims brought by Health Care Services Corporation against Peterson Water Treatment relating to RTU-1 are dismissed with prejudice.

_____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**