UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

**HEALTH CARE SERVICES
CORPORATION,**

    **Plaintiff,**

    v.                                               **CIV. NO. 09-1213 ACT/LFG**

**SOUTHWEST TRANE and
PETERSON WATER TREATMENT,**

    **Defendants,**

    **and**

**AMERICAN HALLMARK INSURANCE
COMPANY OF TEXAS,**

    **Plaintiff-in-Intervention,**

    **v.**

**PETERSON WATER TREATMENT,**

    **Defendant-in-Intervention.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Southwest Trane, Inc.,'s ("Trane") Motion for Summary Judgment filed September 24, 2010 [Doc. 82]. Trane filed its Memorandum of Points and Authorities in Support of its Motion for Summary Judgment on September 24, 2010 [Doc. 83]. Health Care Services Corporation ("HCSC") filed its Memorandum Brief in Support of Response and Opposition to Southwest Trane, Inc.'s Motion for Summary Judgment on October 12, 2010 [Doc. 85], and Trane filed its Reply on October 26, 2010 [Doc. 93].

    HCSC filed a Complaint on December 20, 2009, asserting breach of contract, breach of implied covenant of good faith and fair dealing and negligence against Trane. The facts underlying

these claims are that on or about July 2, 2008, after an inspection of HCSC's cooling towers, Trane, who installed and serviced the units, recommended that the scale buildup on the cooling towers RTU-1 and RTU-2 be removed. Peterson Water Treatment ("Peterson") cleaned the cooling towers. The cleaning which consisted of an acid wash was done between July 11-13, 2008. On July 13, 2008, Peterson discovered that one of the units, RTU-2, shut down.

Undisputed facts.

In January of 2007, HCSC put an air conditioning unit ("HVAC Unit") on the Blue Cross/Blue Shield Office building. On March 2, 2007, Trane contracted to service the HVAC Unit. The Service Agreement included the following exclusion:

> **Exclusions: Ultraviolet light replacement, claimed effectiveness of Dolphin 2000, or be responsiblity(sic) for damage to system components do(sic) to in-effective performance of the Dolphin 2000 non-chemical treatment system, test and balance services. (Calibration change over sequence, calibrate controllers were excluded by Pro Control Services)

> Brian Garton ("Garton"), an employee of Trane, testified to the following:

> Q. When did Trane determine that something had to be done in order to remove the scaling in RTU-2?....
> A. Probably that July time frame.
> Q. Of 2007?
> A. Yes.

[Doc. 101, Exh. 3 at 30.]

Over time and before the incident at issue, Trane performed regular service and maintenance on the Dolphin Unit. Garton testified to the following service reports:

> Q. Let me hand you what the reporter has marked as Exhibit 94. And could you tell me what that is?...
> A. It's a service report for Southwest Trane that a technician has filled out for being on the Blue Cross-Blue Shield site.
> ...
>
> Q. And Procedure – under Procedure, it says 6/28/[07], the Dolphin rep has ordered a new sensor. I will install it in the a.m." He said: "if this don't fix it, he will order

|   |   |
|---|---|
|   | a new – I don't – I can't read the last – |
| A. | "Controller." |
| Q. | "Controller." Now, was this work that he would install the sensor, would that be under the contract – the maintenance contract, or does that fall under the Dolphin exclusion?" |
| A. | It would have fallen under the Dolphin exclusion, but because we are – we were the HVAC maintenance provider for Blue Cross-Blue Shield at that site, basically a courtesy thing to go ahead and install the sensor. |
| Q. | Since it fell outside the maintenance contract, would you have been – had the right to bill for this work? |
| A. | Yes. |
| Q. | But you chose not to in this instance? |
| A. | Yes. |

...

| | |
|---|---|
| Q. | Let me hand you what the reporter has marked as Exhibit 95 and ask you to identify that. |
| A. | This is another Southwest Trane service report filled out by Shawn Tillman, a Southwest Trane service technician. |

...

| | |
|---|---|
| Q. | This was October 19th, '07, correct? |
| A. | Yes. |
| Q. | Now, it says: "Description: Do monthly check on the Dolphin system," correct: |
| A. | Yes. |
| Q. | Why is he doing a monthly check on a system that's excluded under the maintenance contract? |
| A. | Again, as another courtesy because we are the Blue Cross-Blue Shield HVAC service provider. Shawn Tillman was trained by the Dolphin rep and, as a courtesy, so we did not have issues with the east unit, RTU-1, we would do water checks to make sure that things were not getting out of hand, so we didn't run into more scaling issues. |
| Q. | Were you doing that on behalf of the Dolphin rep as well, helping him? |
| A. | Blue Cross-Blue shield. |
| Q. | Okay. All right. It says down in the last in last – in the middle of that paragraph: "Shut Dolphin down and pulled sensor. It was scaled over very bad," underlined. Did you become aware of this report, that we had very bad scaling in October on the sensor? |
| A. | Yes. |
| Q. | So by October, at least, October 19th of 2007, there was – Trane had knowledge that we've got very bad scaling, correct? |
| A. | On the sensor. |
| Q. | On the sensor. Okay. |

...

| | |
|---|---|
| Q. | Let me hand you a third one, Exhibit 96, and ask you to take a look at that. It's dated |

3

|   |   |
|---|---|
|   | 11/16/07, correct? |
| A. | Yes. |
| Q. | And it says: "Procedure: Monthly check on Dolphin system." Am I reading that correctly? |
| A. | Yes. |
| Q. | And then at the bottom of the narrative Procedure, it says: "Pulled sensor and found scaled over again." And I can't – is that – can you read that, where it says "scaled over again" and that next word? |
| A. | "Pulled sensor and found scaled over again. Cleaned sensor uni[sic] went into blow down and was reading 8600. Will seek advice from Dolphin manufacturing about this happening for the second time." |
| Q. | Now was this work, the monthly checking – so am I correct in saying your technician was doing a monthly check on the Dolphin system? |
| A. | Yes. |
| Q. | So you were out there every month? |
| A. | Yes. |
| Q. | And that's without being called; that's just a normal visit? |
| A. | It was something that Blue Cross-Blue Shield requested Trane provide you know, knowing that we could potentially have a scaling issue. |
| Q. | So is that when the monthlies began, when it was – there was an indication that might be scaling problems. |
| A. |  Yes. |
| Q. | Now you're watching this monthly? |
| A. | Yes. |
| Q. | Why do you have – why do you increase your visits to monthly? |
| A. | Only on the Dolphin monitoring. |
| Q. | There's a concern about scaling, correct? |
| A. | Yes. Yeah. |
| Q. | And again, Southwest Trane did not bill Health Care for this work, right? |
| A. | No. |
| Q. | I'm handing you what has been marked as Exhibit 97, again another service report. This one dated 11/21/07, correct? |
| A. | Yes. |
| Q. | And under Procedure, it says: "Replace the water sensor on the east Dolphin unit. Check for proper operation." Did I read that correctly? |
| A. | Yes. |
| ... |   |
| Q. | All of these service reports, the four I've shown you, are beyond the scope of the service agreement between Trane and Health Care, correct? |
| A. | Yes. |

[Doc. 85, Exh. A at 38-44.]

Liz Carrillo, the designated representative of HCSC, testified that HCSC contacted Peterson

to perform treatment to remove the scaling. *Id.* at Exh. 75-77. HSCS asked Trane to run the Peterson contract through the Trane contract because Peterson was not a HCSC preferred vendor. She further testified that Trane sent HCSC two proposals for Peterson to do the acid cleaning and both were rejected by HCSC. *Id.* at Exh. 7 at 87.

On July 3, 2008, Eric Webster ("Webster"), of Trane, and Carrillo exchanged the following e-mails.

> Liz, please find the attached proposal for acid cleaning of the two towers.
> This would be done over a two-weekend period (July 12-13 and July 19-20).
> Please call me with any questions or concerns.
>
> Eric,
> We just met with Eric [Fritz] from Peterson Water Treatment. Eric will begin the
> process Friday evening after 6:00 p.m. on RTU2 with the chemical, run
> all-right(sic), come back in on Saturday the 12th at 7:00 a.m. and complete
> the
> RTU2 process. He will then begin on RTU1 at 1:00 p.m., run all-right(sic) and
> come back in on Sunday the 13th at 7:00 a.m. and complete by 3:00p.m.
> We will not have the sanitary drain by the 12th. I have spoken with our
> engineers and are looking at the recommendation. In the meantime, we
> reviewed and Eric was fine with the solution on how to drain straight
> into
> the sewer drain.
>
>
> Eric, it still indicates a two week-end period and the price did not come down much.
>
> Please re work the quote and send back to me. Thanks, Liz.
>
>
>
> Sorry Liz, forgot to edit the days worked. And yes the price change did
> reflect our labor reduction from double time to time and a half. I have
> not received any pricing changes from Peterson as of yet.
>
>
> thanks Eric. Re send when you receive price changes from Peterson. Thanks!

[Doc. 85, Exh. I.]

On July 7, 2008, Webster and Carrillo exchanged the following e-mails:.

Liz, I called and left a message with Petersons and they have not gotten back with a reduced number. If I hear back from him I will let you know.

Thanks Eric. I would suspect that it will be reduced. However, we do need to keep the schedule for this Friday – Saturday – Sunday.

*Id.*

On July 9, 2008, Webster and Carrillo exchanged the following e-mails.

Eric,
Petersons schedule for this weekend are:
July 11, 6:00 - 7:00 p.m.
July 12, 1:00 - 3 or 4 p.m.
July 13, 7:00 - 12 (approx. 5 hours, if needed).

Liz, I am going to need the proposal signed or a PO issued from Blue Cross in order to get this set up. Have not seen anything form you yet.

*Id.*

On July 9, 2008, Webster, Carrillo and Veronica Romero from HCSC exchanged the following e-mails:

Veronica, please email the PO once you get the number to Eric Webster. Thanks.

Eric, this should be by this afternoon.

Hello Eric,
The PO number is 4006160. Have a great day.

*Id.*

On July 12-13, 2008, Peterson performed the acid cleaning of the cooling coils with in the HVAC Unit. This cleaning allegedly resulted in damage to the system.

HCSC's experts testified that the only reasonable method to clean the cooling coils was through an acid cleaning process. They have also testified that an attendant risk in acid cleaning the cooling coils is damage to the HVAC system components.

Legal standard.

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and the movant is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). Summary judgment is "properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed.R.Civ.P. 1).

The movant bears the initial burden of "show[ing] that there is an absence of evidence to support the nonmoving party's case." *Bacchus Indus., Inc. v. Arvin Indus., Inc*., 939 F.2d 887, 891 (10th Cir. 1991) (internal quotation marks omitted); *Celotex Corp. v. Catrett*, 477 U.S. at 323. Once the movant meets this burden, Rule 56(e) requires the non-moving party to designate specific facts that would be admissible in evidence showing that there is a genuine issue for trial. *Id*. at 324. "[T]here is no evidence for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable...or is not significantly probative,...summary judgment may be granted." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 249 (1986) (internal citations omitted). Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

When jurisdiction in federal court is based upon diversity of citizenship, the Court applies the substantive law of the forum state. *Beardsley v. Farmland Co-Op, Inc*., 530 F.3d 1309, 1313 (10th Cir. 2008).

Legal analysis.

a.     Breach of contract.

In Count I, HCSC asserts a claim for breach of contract against Trane. Specifically, HCSC alleges that Trane breached the Service Agreement: "Trane failed to provide work that was performed in accordance with the professional standards of contractors providing similar services: Trane failed to assume responsiblity for and pay HCSC for its losses and damages sustained arising out of the acts of Peterson, as Trane's subcontractor." Complaint, Doc. A at ¶35.

Trane argues that the exclusion provision of the Service Agreement is unambiguous and should be enforced by the Court. In support of their argument, Trane states that HCSC's experts have testified that the cause of the scaling of the HVAC cooling coils was the result of inadequate water treatment by the Dolphin 2000 water treatment system. HSCS's experts further testified that the only viable method to clean the scaled coils was through acid cleaning.

In response, HCSC argues that the exclusion is ambiguous. In support of this HCSC refers to other provisions of the Service Agreement in which Trane agreed to maintain the coils in question as part of the agreement. It further argues that by performing services despite the exclusion, HCSC and Trane modified the Service Agreement.

New Mexico courts recognize the principle that contracts may be modified by the conduct of the contracting parties. In *Rogers v. Eddy County Board of Commissioners*, 1992 WL 372585 (10th Cir. 1992) (unpublished), the Tenth Circuit wrote the following:

> [A] contract can be modified by the conduct of the parties once its existence is established. *Elephant Butte Resort Marine, Inc. V. Woolridge*, 102 N.M., 286, 694 P.2d 1351 (1985). "[T]he conduct of the parties in *performing* an agreement may be relevant to show a modification or waiver of a provision inconsistent with their conduct in the performance of that agreement." *Hale Contracting Co. v. United New Mexico Bank of Albuquerque*, 110 N.M. 712, 799 P.2d 581, 589 (1990) (emphasis in original). See also N.M. Ann. § 55-2-207(3).

> It follows, then, when the parties undertake a course of mutual conduct contrary to the written terms of an agreement, that conduct forms a modification of the original contract.

*Rogers*, 1992 WL 372585, *2.

The Supreme Court of New Mexico in *Medina v. Sunstate Realty, Inc*., 119 N.M. 136, 889 P.2d 171 (1995) held that a residential construction contract could be modified orally. In its opinion, the Court stated that:

> "The parties to a written contract may modify that contract by express or implied agreement as shown by their words and conduct." (citation omitted).

Trane argues in its Reply, that the exclusion was for damages caused by the Dolphin not the maintenance of the Dolphin and thus Trane's maintenance of the Dolphin did not modify the contract. However, testimony from Trane's own representative, Garton, is evidence that the contract was modified by both HSCS's and Trane's conduct.[1] Whether the contract was modified and, if so, what terms of the contract were modified are questions for the jury. Thus, the Court will deny summary judgment on HCSC's breach of contract claim against Trane.

    b.    Breach of covenant of good faith and fair dealing.

HCSC alleges that Trane violated its contractual duty of good faith and fair dealing. In New Mexico, every contract imposes a duty, whether express or not, of good faith and fair dealing upon all parties in the performance and enforcement of the agreement. *WXI/ZSw. Malls v. Mueller*, 110 P.3d 1080, 1087 (N.M.App. 2005), *cert. denied*, 112 P.3d 1111. The implied covenant prohibits each party from taking action that would injure the right of the other to receive the benefits of the contract. *Watson Truck & Supply Co. v. Males*, 801 P.2d 639, 642 (1990). To establish a breach of the implied covenant, a claimant must show that the defendant wrongfully and intentionally engaged in

---

[1] Trane also argues that the service reports are inadmissible. The testimony of Garton has demonstrated their reliability and relevance. Thus, the Court finds that the service reports are admissible evidence.

action to the detriment of the claimant in order to deprive the claimant of contractual benefits. *WXI/ZSw. Malls*, 110 P.3d at 1087-88.

"[P]arties are liable for breaching the covenant when their conduct frustrates the 'over-arching purpose' of the contract by taking advantage of their position to control implementation of the agreement's terms." *Guidance Endodontics, LLC, v. Dentsply International, Inc*., 708 F. Supp. 2d 1271, 1281 (D. N.M. 2010) (citation omitted). "On the other hand one cannot assert a breach of the implied covenant for conduct that the contract's express provisions governs." *Id.* (citation omitted). The implied covenant cannot be used to override express terms of the contract. *Sanders v. Fed. Ground Package System*, 2008-NMCS-040  ¶27, 144 N.M. 449, 188 P.3d 1800.

In HCSC's Complaint, HCSC makes the following allegations regarding their claim for breach of implied covenant:

> 40. The parties intended, and HCSC reasonably expected, that Trane and its subcontractors would properly maintain and treat HCSC's equipment and property that was subject to the Service Agreement.
> 41. Despite the parties' intent, and HCSC's reasonable expectations, Trane and its subcontractors damaged and destroyed HCSC's equipment and property.
> 42. Trane breached the implied covenant of good faith and fair dealing because it did not act consistent with the parties' intent, did not act consistent with NCSC's reasonable and fully-disclosed expectations, and acted so as to deprive HCSC of the benefits of the Service Agreement.

Complaint, Doc. 1 at 7-8.

Trane argues that HCSC's claims arise out of the contract. HCSC's assertion in its Reply that "[i]n the event the jury decides that Trane did not breach the Service Agreement, however, HCSC believes the jury should decide whether Trane violated the Implied Covenant of Good Faith and Fair Dealing, which is implied in every contract under New Mexico law" is without merit  Doc. 85 at 21. HCSC's allegations are breach of contract claims. There are no allegations that Trane used the contract to HCSC's detriment.   The Court will grant Trane's motion for summary judgment on

Count II of HCSC's Complaint.

    3.    Negligence.

Trane argues that it did not hire Peterson as a subcontractor and thus is not liable for its alleged negligence. In support of this argument, Trane cites some authority on agency and actual authority. In its Response, HCSC relies on authority concerning contracts in which there is not an agreement on a "specific price for the treatment." Doc. 85 at 16.

An agent is a person who, by agreement, represents the principal in business transactions with third persons. UJI13-401 NMSA. New Mexico UJI 13-401 states:

> An agent is a person who, by agreement with another called the principal, represents the principal in dealings with third persons or transacts some other business, manages some affair or does some service for the principal, with or without compensation. The agreement may be oral or written and may be either expressed or implied by a course of conduct showing an intention that the relationship exists.

UJI 13-401 NMSA.

Even when there is no actual agency with the right to control, a principal may still be held liable if it has clothed the agent with apparent authority, that is, if the principal has by its statements, acts or conduct, led the plaintiff to reasonably believe the agent was acting as such and if the plaintiff deal with the agent in justifiable reliance upon the principal's representations. UJI 13-408 NMSA.

Trane relies on the facts that it submitted two proposals to HCSC for Peterson to do the cleaning that were rejected by HCSC. After rejecting the proposals, HCSC sent Trane a purchase order number with no terms or conditions. It also relies on the fact that HCSC met with Peterson without Trane being present and that NCSC directed Peterson to change the work schedule by cleaning two units at the same time. Trane also asserts that he never billed for Peterson's work.

HCSC relies on the e-mail exchanges between Webster and Carrillo.[2]  These e-mails demonstrate that prior to the acid cleaning HCSC and Trane were in communication regarding the work to be performed by Peterson.  The e-mails further demonstrate that Trane submitted proposals on behalf of Peterson and when they were rejected requested a PO number and received the PO number prior to the acid cleaning.

The Court will deny summary judgment as to HCSC's claim of negligence against Trane. The fact that HCSC rejected the first two proposals does not negate the fact that there were on-going negotiations between Trane and Peterson to get the acid cleaning performed.  In addition, the fact that there was no contract does not negate the fact that Webster stated in his e-mail that he only needed a "PO" issued to"get this set up."  Doc. 85, Exh. I.  Further, it is undisputed that Trane received the PO prior to the acid cleaning.   Based on the evidence presented to date, the Court cannot find that there was no agency relationship between Trane and Peterson.

**IT IS THEREFORE ORDERED** that Southwest Trane, Inc.,'s Motion for Summary Judgment [Doc. 82] is granted in part and denied in part.

**IT IS FURTHER ORDERED** that Count II of Health Care Services Corporation's Complaint is dismissed with prejudice.

_____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**

---

[2]HCSC further relies on deposition testimony that at least five individuals believed that Trane hired Peterson as a subcontractor.  The designation of a party as an agent is not controlling.  *Carlsberg Management Co. v. State*, 116 N.M. 247, 251, 861 P.2d 288 (Ct. App. 1993) (citations omitted).  It is rather the nature of action, not party's designation of the relationship, that is controlling. *Id.*