UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

Civil Action No. 09-CV-1213-ACT-LFG

HEALTH CARE SERVICES CORPORATION,

Plaintiff,

v.

SOUTHWEST TRANE,
PETERSON WATER TREATMENT,

Defendant.

# **PLAINTIFF'S TRIAL BRIEF**

Health Care Services Corporation ("HCSC") submits this Trial Brief outlining HCSC's basic legal theories and the anticipated evidence regarding those theories for trial, pursuant to the Court's Trial Notice [Document #40].

## **INTRODUCTION**

This dispute arises out of HCSC's HVAC system that was installed and placed into operation in January 2007 at HCSC's Headquarters location. The HVAC system was custom-made to fit HCSC's building, and HCSC spent a considerable sum of money purchasing and installing the two Roof Top Units ("RTUs"). HCSC and Defendant Southwest Trane ("Trane") entered into a Service Agreement in March, 2007, which helped ensure that HCSC had knowledgeable people overseeing the HVAC equipment's operation. Trane represented itself as qualified to perform that oversight.

In the year and a half that the RTUs were in service, scaling on the coils of the RTUs became substantial. The parties agreed that an acid treatment to remove or mitigate the scaling

1

was warranted. Defendant Peterson Water Treatment ("Peterson") was able to perform that type of cleaning, but due to HCSC's stringent contract requirements, HCSC could not enter into a direct contact with Peterson. This was understood by all of the parties. Instead, all three companies proceeded under the proposition that Trane would hire Peterson to act as its subcontractor. Tellingly, both HCSC and Peterson believe that is exactly what happened. Trane, and only Trane, disputes that it had a subcontractor relationship with Peterson regarding the acid treatment on the RTUs.

In any event, the parties agree that various components of RTU-2 were damaged by acid corrosion, which perforated the RTU-2 copper coils and other components of RTU-2. HCSC incurred approximately $780,000 to repair the damaged equipment and provide temporary cooling to the building during that work.

HCSC asserted breach of contract and negligence claims against Trane, while asserting a negligence claim against Peterson. The negligence claim against Peterson involves only the damage caused by the acid cleaning. HCSC's breach of contract claim against Trane extends to both the acid cleaning performed by Trane's subcontractor and also Trane's obligations to monitor and maintain the RTUs, including responsibility for the scaling of the RTU-1 and RTU-2 coils, which Defendants contend was severe and warranted replacement of the coils on both RTUs.

The facts surrounding the acid solution treatment itself appear to be largely undisputed. However, there are several issues that are in dispute, as summarized below.

## **Peterson was Hired as Trane's Subcontractor; Both Defendants are Responsible for the Acid Cleaning**

While Trane contends that it did not hire Peterson as a subcontractor, the facts illustrate otherwise. As Ms. Carrillo will testify, when HCSC, Trane, and Peterson first discussed the acid treatment, all three parties agreed that Trane would hire Peterson due to HCSC's contracting requirements. From that point forward, HCSC's communications about hiring Peterson went through Eric Webster, a Trane employee. Those communications show the following sequence of events. First, Trane provided a proposal to have Peterson perform the acid treatment over a two-weekend period. After additional email correspondence from HCSC which explained that Peterson advised it could complete the treatment over one weekend, Trane submitted a second proposal at a lower price, again over a two-weekend period. Trane explained the price reduction as a shift from double-time for Trane's services to time-and-a-half. Accordingly, because Trane would be charging for its hourly time, HCSC understood that Trane intended to play some role in the acid treatments (and to be responsible for them).

HCSC and Trane continued to discuss Peterson conducting the treatment. Ultimately, as the weekend scheduled for the treatment (Friday July 11 – Sunday, July 13, 2008) approached, HCSC provided Trane with Peterson's anticipated schedule for the treatment. Trane's only response was to advise HCSC that Trane would need the proposal signed or a PO issued in order to set up the treatment from Peterson. Mr. Webster sent that message to Ms. Carrillo at 1:38 pm on the Wednesday before the treatment was scheduled to start. Ms. Carrillo responded less than ten minutes later by sending a message to a coworker, requesting that she email Mr. Webster the PO, and advising Mr. Webster that it should be completed by later that afternoon. HCSC in fact provided the PO number that same afternoon. Based on the above-described email

3

correspondence, HCSC had provided Trane with all of the information Trane needed to proceed with the Peterson acid treatment, as the parties had arranged. Peterson proceeded to perform the acid cleaning that weekend. While Trane later took (and continues to take) the position that it did not hire Peterson, the evidence is to the contrary.

Depositions have made clear that Trane's position is based on the fact that HCSC did not accept either of the written proposals Trane submitted to HCSC. However, the proposals were only one of the two ways Trane advised HCSC could move forward with the arrangement. HCSC proceeded with the second option: issuing a PO to Trane.

Trane also argues that the parties did not agree on a specific price for the treatment. Courts have refused to allow such "mechanical application of contract law." *Beaver v. Brumlow*, 231 P.3d 628, 636 (N.M. App. 2010) (enforcing contract when it was "through no fault of Buyers that formal contract documents were not written with a set price and terms"). "A valid contract of sale may be made without any stipulation as to the price, the law in such case implying that the price is the reasonable value of the thing which is the subject-matter of the agreement." *Id.*, 231 P.3d at 635. Elaborating on that line of authority, courts have discussed how to determine whether a contract fails for indefiniteness. Referring to the Restatement of Contracts, it is essential that the terms of the contract are "reasonably certain." "'The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.'" *Padilla v. RRA, Inc.*, 946 P.2d 1122, 1125 (N.M. App. 1997) (citing to Restatement of Contracts § 33(2)). Comments to that same section note that a reasonable price will be presumed, and that the same principles apply to contracts for the rendition of services. *Id.*, 946 P.2d at 1125-26. "Thus, when two parties have bargained for one

4

of them to provide personal services to the other but they have left the payment term to later negotiations, a court in appropriate circumstances may determine that the parties have reached an enforceable contract to provide the services for a 'reasonable' payment." *Id.* at 1126. As is apparent from the discussions between Trane and HCSC, the price depended on Peterson's input and was expected to decrease.

Further, the law recognizes that "[i]f the term subject to agreement is also one that is subject to complete concession by the party that wants to have the agreement performed, that party's concession has been held to cure the indefiniteness." *Id.* Here, through its $6,000 PO provided to Trane, HCSC conceded to Trane that it was ready, willing and able to make payment for Peterson's services. *See, id.* The PO HCSC issued exceeded all of the prices submitted in Trane's proposals. Accordingly, HCSC inherently agreed to whatever the charges would be, regardless of the exact price – in large part because Trane and Peterson made clear to HCSC that the condition of the RTUs needed to be addressed as soon as possible (and was possibly the source of many of HCSC's issues with the RTUs, extending back for months).

Any attempt Trane may make to claim that the time of performance was uncertain should likewise fail. Courts have applied similar consideration for time and place of performance. *Padilla*, 946 P.2d at 1124, n.1 ("As for the time and place of performance, when such terms have not been negotiated, courts generally impose a reasonableness standard"); *Beaver*, 231 P.3d at 636 ("Moreover, when an agreement does not specify a time for performance, it is implied that it is to be performed within a reasonable time, and what is a reasonable time is a question of fact."). Here, there is significant correspondence relating to the dates on which Peterson intended to perform the acid treatment. The relevant facts and events, coupled with Peterson's

agreement that it was acting as Trane's subcontractor, will support HCSC's position that Trane hired Peterson to perform the services that damaged HCSC's property.

**<u>Trane Breached the Service Agreement, Both in its Maintenance of the RTUs and in the Acid Cleaning Damage Caused by Trane's Subcontractor.</u>**

As set forth above, Trane subcontracted Peterson for the acid cleaning, which clearly caused substantial damage HCSC's RTU equipment. This is one way in which Trane breached its contract with HCSC. Further, Trane breached its obligations to monitor and maintain the RTUs and prevent the scaling on the RTUs from becoming such a substantial problem in the first place. As the Court ruled on HCSC's Motion in Limine Regarding Southwest Trane's Breach of Contract, HCSC "has timely asserted a claim against [Trane] for breach of the Service Agreement on the grounds that Trane failed to properly monitor and maintain the coils and that [Plaintiff] can introduce evidence on this issue." [Doc. No. 127 at p. 1 and 4; see also Doc. Nos. 112, and 122]. The evidence will show that Trane failed to address the build-up of scaling on the RTUs until shortly before the acid cleaning in July 2008, by which time the scaling was excessive. Thus, Trane is liable for both the acid corrosion related damage to RTU-2 and also the scaling damage to both the RTUs.

Trane's defense to the breach of contract action is to attempt to hide behind an exclusion in the Service Agreement that relates to the Dolphin Unit, which is a water treatment component of the RTUs. The Service Agreement states, among other things, in a section titled Exclusions: "claimed effectiveness of Dolphin 2000, or be responsibility [sic] for damage to system components do [sic] to in-effective performance of the Dolphin 2000 non-chemical treatment system. . . ." At first blush, the exclusion language may appear to support Trane's argument

6

that Trane was not responsible for work related to the Dolphin Unit. Trane's arguments are wrong, however, for a few reasons.

First, the acid corrosion to RTU-2 is not "do [sic] to in-effective performance of the Dolphin." The acid treatment corroded holes in the RTU-2 coils and ruined other components of RTU-2, requiring extensive repair work. Such acid damage is not caused by the Dolphin; such damage was caused independently by the manner in which Peterson and Trane performed the acid cleaning. Thus, the exclusion is not applicable to the acid damage.

Second, Trane's representations prior to entering the Service Agreement, and Trane's actions after the Agreement was made, show that Trane in fact lead HCSC to believe that Trane was monitoring and maintaining the RTUs, including problems such as scaling, regardless of how effectively the Dolphin Unit was performing. When Trane introduced HCSC to the RTU systems, HCSC inquired about the exclusion of the Dolphin from Trane's work, and Trane told HCSC that Trane was going to be monitoring how the Dolphin was working and make sure that the coils do not become scaled, as that would result in the need for the scaling to be cleaned. Specifically, Brian Garton of Trane told HCSC at that meeting:

> I guess it was pretty much a Blue Cross decision to go with this non-chemical type control and that's why Trane put in that disclaimer . . . **what we're gonna do is, it's in our best interest to really monitor how this thing is working** this summer because we don't want that to mess up the fill, **and we don't want it to really scale up that copper loop that's inside of this Tower because then somebody's got to get in there and scrape all that calcium deposit off of there and get it back clean**, because we've got to have that good heat transfer.
> *See Bradbury Stamm Training Video* at 34:10 – 34:46 (Exhibit J to Doc. #85-10), *submitted by all parties as a potential trial exhibit*.

Those statements, preserved on the video, show the limited application of the exclusion upon which Trane is attempting to avoid all liability for breaching its contract.

7

Further, Trane performed regular service and maintenance on the Dolphin Unit. Trane's Field Reports specifically reference work performed on the Dolphin Unit, as well as internal HCSC email correspondence that references the same. Additionally, the evidence shows that Trane was involved with removing scale build-up from various RTU parts. Trane was aware of scaling on the RTUs prior to the acid cleaning, but allowed it to continue as it became increasingly severe. In addition to the first-hand knowledge that Trane had about scale buildup, Trane also received notice that they should check on the condenser coils themselves. Specifically, Mark McKee from Sigler acknowledged the need to keep Silica levels in check, requesting that going forward on a monthly basis, Trane "Visually inspect tubes on evap condenser." That email was sent both to HCSC and Trane. Trane was in a position to know that it was likely that the RTUs required attention relating to scale buildup long before the condition had reached the urgency it had when Trane finally recommended the acid treatment around July 2, 2008.

Nevertheless, now faced with accountability for its actions, Trane seeks to point to the exclusion and claim that it is not responsible for any damage associated with the RTUs. However, after considering New Mexico state precedent, the United States Court of Appeals for the Tenth Circuit has confirmed that "when the parties undertake a course of mutual conduct contrary to the written terms of an agreement, that conduct forms a modification of the original contract." *Rogers v. Eddy County Bd. Comm'rs*, 982 F.2d 529, 1992 WL 372585, at *2 (10th Cir. Dec. 18, 1992). New Mexico courts have noted modifications "may be made even though the contract itself requires all modifications to be in writing." *Medina v. Sunstate Realty, Inc.*, 889 P.2d 171, 173 (N.M. 1995) (finding abuse of discretion to exclude evidence of oral

modification). "Thus New Mexico adheres to the general rule set forth in Professor Williston's treatise on contracts that 'a written contract may be modified, rescinded or discharged by subsequent oral agreement.'" *Id.* at 174. Further, "parties to a written contract may modify that contract by express or implied agreement as shown by their words and conduct." *Id.* HCSC reasonably relied on Trane's representations that Trane would monitor and maintain the RTUs, including the prevention of scaling. Accordingly, regardless of the exclusion in the Service Agreement, the fact remains that Trane performed services on the Dolphin Units and RTUs and is responsible for the damages related to its actions, including both the acid cleaning damage to RTU-2 and the scaling damage to the coils of RTU-1.[1]

### The Trane/Peterson Acid Cleaning Undisputedly Damaged HCSC's RTU-2 Equipment, and Such Damage was Caused by the Negligence of Peterson and Trane.

As discussed above, Peterson began the acid cleaning on the RTUs on or around July 11, 2008. Peterson initiated the cleaning knowing the circumstances under which the cleaning would take place, including the decision to clean both RTUs at the same time and the decision to proceed with the acid cleaning with the RTUs in full operation. While running the RTUs in full operation increased the risk of acid damage to the RTUs, Peterson did not advise HCSC of the nature or extent of such possible risk and proceeded with the acid wash.

---

[1] Trane apparently disputes whether any damages to RTU-1 remain at issue in the case following the Court's grant of partial summary judgment. As set forth in HCSC's Motion to Clarify, HCSC has asserted breach of contract claims against Trane that extend beyond Peterson's acid cleaning and involve Trane's failure to monitor and maintain the RTU coils, causing scaling that defendants contend warranted replacing the RTU-1 coils, irrespective of the acid cleaning damage to the coils. Thus, the Court's ruling on Peterson's partial summary judgment that RTU-1 did not sustain acid-related damage does not extend to the breach of contract claim against Trane.

On the following day, Peterson's employee discovered that the first treatment did not sufficiently clean the RTU coils. Peterson repeated the procedure and added additional acid to the RTUs. During the second night of cleaning, RTU-2 shut down. On July 13, 2008, after extensive troubleshooting by Trane and Peterson, Trane and Peterson discovered that RTU-2 had perforated coils due to acid corrosion and that the system was damaged. When the damage was discovered, the Peterson employee that performed the acid cleaning stated to HCSC and Trane on site that it was his fault. Shortly after the damage Peterson's employee noted in a written summary of the events that had transpired that he "took some calculated risks during the procedure." Peterson did not monitor the acid cleaning overnight; the acid cleaning of the RTUs was left to run for several hours unsupervised, despite the risks presented by the acid and the circumstances of which Peterson was aware. Peterson and Trane were negligent in the performance of the acid cleaning, which caused RTU-2 to be ruined due to the acid corrosion.

Despite the fact that Trane and Peterson were hired as professionals in their respective fields to perform the acid cleaning for HCSC, the Defendants now blame HCSC for the acid damage that occurred during the Defendants' acid treatment. It appears that Defendants believe that HCSC is responsible for determining under what conditions it would be safe to perform the acid treatment and to monitor the acid cleaning overnight, while Defendants agreed to proceed with the acid cleaning and provided no monitoring of the acid cleaning themselves. HCSC is not in the business of servicing HVAC equipment or performing water treatments, and HCSC was not in a position to assess the specific conditions and associated levels of risk under which it is reasonable to conduct an acid treatment; that is why HCSC pays consultants such as Trane, and its subcontractor Peterson, for such services. Neither Trane nor Peterson sufficiently advised

HCSC regarding the risk potential associated with the decisions that were made surrounding how the acid treatment would be performed. HCSC will testify at trail that if they had been advised about any potential danger to the equipment, HCSC would have taken further measures to assess the risks and potential alternatives.

While Defendants may argue that HCSC's decisions were a cause of the damage, the evidence will show that Defendants ultimately approved of those decisions and proceeded to perform the acid treatment as such. HCSC simply should not be held to the same standard as Trane (HVAC supplier and maintenance personnel) or Peterson (Water Treatment and Acid Treatment professionals) about being responsible for making decisions about how an acid cleaning should be conducted and potential outcomes for the same.

**HCSC has Asserted and Supported Damages in the Amount of $780,000.**

HCSC incurred damages in the amount of approximately $780,000 due to the Defendants' actions. HCSC has provided the support for that figure through invoices for the repairs HCSC made to the RTUs. HCSC will testify to those damages at trial. The damages suffered by HCSC are clear and, generally speaking, beyond dispute.

**Conclusion.**

The evidence is clear that Trane and Peterson are both liable for the damages HCSC sustained to HCSC's RTUs. There can be no question that Peterson's attempted treatment ruined RTU-2. Acid corrupted the internal components of the RTU-2, causing it to fail on the morning of July 13, 2008. Scaling, if not acid, also damaged the coils of RTU-1. HCSC's damages are clear. Both defendants are liable for the damages.

Respectfully submitted January 27, 2011.

11

YATES LAW FIRM, LLC

  /s/ Dart M. Winkler
Russell E. Yates, *admitted pro hac vice*
Dart M. Winkler, *admitted pro hac vice*
Matthew S. Mersfelder, *admitted pro hac vice*
1900 Wazee Street, Suite 203
Denver, CO 80202
Phone:    (303) 722-2810
Fax:         (303) 722-2890

and

YENSON, LYNN, ALLEN & WOSICK
Joseph B. Wosick
4908 Alameda, NE
Albuquerque, NM  87113-1736
Phone:    (505) 266-3995
Fax:         (505) 268-6694

ATTORNEYS FOR PLAINTIFF HEALTH CARE SERVICES CORPORATION

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 27th day of January, 2011, I filed the foregoing **PLAINTIFF'S TRIAL BRIEF** electronically through the CM/ECF system, which caused the following parties or counsel to be served by electronic means, as more fully reflected on the Notice of Electronic Filing:

S. Barry Paisner, Attorney for Defendant Southwest Trane
bpaisner@hinklelawfirm.com
Jaclyn M McLean, Attorney for Defendant Southwest Trane
jmclean@hinklelawfirm.com

Daniel W. Lewis, Attorney for Defendant Peterson Water Treatment
dlewis@allenlawnm.com
Christopher P. Winters, Attorney for Defendant Peterson Water Treatment
cwinters@allenlawnm.com

Scott P. Hatcher, Attorney for Intervenor American Hallmark Insurance Company of Texas
shatcher@hatchertebo.com

Charles J, Noya, Attorney for Defendant Peterson Water Treatment
cnoyalaw@gmail.com

    /s/ Dart M. Winkler
Dart M. Winkler, Attorney for Plaintiff