**UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF NEW MEXICO**

HEALTH CARE SERVICES
CORPORATION,

    **Plaintiff,**

    v.                                          CIV. NO. 09-1213 ACT/LFG

SOUTHWEST TRANE and
PETERSON WATER TREATMENT,

    **Defendants,**

    **and**

AMERICAN HALLMARK INSURANCE
COMPANY OF TEXAS,

    **Plaintiff-in-Intervention,**

    v.

PETERSON WATER TREATMENT,

    **Defendant-in-Intervention.**

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Plaintiff's Brief regarding Clarification of Ruling on Peterson Water Treatment's Motion for Partial Summary Judgment as applied to Trane and Scope of Negligence Claim against Trane filed January 21, 2011[Doc. 140]. Southwest Trane ("Trane") filed its response on January 28, 2011 [Doc. 146]. The parties are seeking an order from this Court clarifying what claims the Plaintiff may assert against Trane at trial. Upon review of the pleadings and the relevant law, the Court finds that Plaintiff's sole claim against Trane is for breach

of contract for failure to monitor and maintain RTU-1 and RTU-2 and the damages as to RTU-1 are limited to the cost of the acid washing.

RTU-1 damages.

Plaintiff may not assert any claim for damages as to RTU-1 other than the cost of the acid washing for two reasons. The first is that the parties stipulated that the relief granted by the Court to Peterson Water Treatment ("Peterson") in its Memorandum Opinion and Order applies equally to Trane. On November 24, 2010, the Court entered a Memorandum Opinion and Order granting Peterson's Motion for Partial Summary Judgment [Doc. 107]. In that Memorandum Opinion and Order the Court specifically found that there was no proof of damages to RTU-1 caused by any alleged negligence of Petersen. The Court specifically found that "[t]he evidence concerning damage to RTU-1 is that the damage did not require that RTU-1 be repaired or replaced and that it could and did remain in operation." [Doc. 107 at 7.]

In December of 2010, the following e-mail exchanges occurred between counsel for Plaintiff and counsel for Trane.

> Dart, I missed your call but got your message. We could draft an in limine motion or some sort of stipulation that tracks the Judge's ruling on Peterson's MSJ. We could state the relief granted by the Court to Peterson in its partial MSJ applies equally to Trane.
> ...
> Barry,
> I did not hear from you today but HSCS is willing to stipulate as outlined below. Please let us know if you need anything in addition to this email confirming the same.
> In any case, there is no need for you to file in limine on this issue.
> ...
> Thanks Dart. I will not file an in limine motion. This based on our agreement that relief granted by the Court in ruling on Peterson's Partial Motion for Summary Judgment applies to Southwest Trane.

[Doc. 146, Exh. A.]

The Court will enforce the parties' stipulation as to RTU-1 and Plaintiff may not recover any damages from Trane as to RTU-1 other than the cost of the acid wash. Stipulations are generally considered judicial admissions, *Vallejos v. C.E. Glass Co.*, 583 F.2d 507, 510 (10th Cir. 1978), and are routinely accepted as they increase efficiency in the judicial process. In this matter, the stipulation obviated the need for a motion in limine. As such, "[t]his court is...reluctant to relieve parties from the benefits, or detriments of their Stipulations." *Stafford v. Crane*, 382 F.3d 1175, 1180 (10th Cir. 2004) (internal quotations and citation omitted). Further, the district court is vested with broad discretion in deciding whether to enforce a parties stipulation or not. *Wheeler v. John Deere Co.*, 935 F.2d 1090, 1098 (10th Cir. 1991).

The second reason for excluding any damages to RTU-1 other than the cost of the acid wash against Trane is that there is no evidence that any failure to monitor or maintain RTU-1 caused any damages other than the scaling that needed to be removed by the acid wash. The undisputed evidence is that RTU-1 remained in operation after it was cleaned in July of 2008 until March of 2009. There is no evidence that there was any repair to RTU-1 until its replacement. The only evidence before the Court as to why RTU-1 was replaced is from Plaintiff's facility manager, Liz Carrillo ("Carrillo"). Carrillo testified as follows:

> Q. Is it accurate that RTU-1 after the acid wash cleaning never failed? In other words, there wasn't a time where – let me ask it differently. RTU-2 failed, all the Freon escaped from it, and it was inoperable, correct?
> A. Correct.
> Q. Did that ever happen to RTU-1?
> A. No.
> Q. The replacement of RTU-1 was something that you did as a precautionary measure for fear that it might fail?
> A. Of the condenser coil, correct.
> Q. Of the condenser coil?
> A. Correct.

[Doc. 146 at Exh. C.]

In addition, Edwin Wales ("Wales"), Plaintiff's facility representative, testified that RTU-1 was functioning and continued to operate until the cooper condenser coils were replaced in March of 2009. [Doc. 146 at Exh. B.

As the Court noted in its Memorandum Opinion and Order [Doc. 107] filed November 24, 2010, it is undisputed that both cooling units had severe scaling before the acid wash performed by Peterson. Plaintiff alleges that RTU-1 was less efficient as the result of scale buildup but there is no evidence as to any damages caused by this inefficiency. The testimony of Plaintiff's own experts, Robert Keith O'Neil and Joseph P. Crosson, is that RTU-1 was operational and did not need repair or replacement after the acid wash. [Doc. 81, Exh. 4 at 78-79, Exh. 5 at 35, 38-39 and Doc 85, Exh. E at LP-CROSSON 000010-12.]

Subsequent to the Court's ruling, Plaintiff has offered the testimony of another expert, William Ivey ("Ivey") to attempt to demonstrate that RTU-1 would have needed to be replaced independent of any alleged damaged caused by Peterson during the acid wash.

> Q. Okay. And then your fourth bullet point conclusion is "The damage that resulted from the acid cleaning is immaterial, as the condensers would have had to be replaced anyway due to the severe scaling," correct?
> A. Correct.
> Q. So, in your opinion, as it turns out, the coils were going to need to be replaced whether the acid cleaning had been performed or not?
> A. Right.
> Q. And would that be the case for both RTU-1 and RTU-2?
> A. Yes.
> Q. And that's due solely to the extent of scaling that had build up on the tubes, correct?
> A. Right. The extent of scaling that's still on RTU-1 or was on there last July when I looked at it. I mean, it's still very scaled.
> Q. And do you have any opinions as to which persons or parties were responsible for the fact that the coils had become that scaled to the pont where they essentially needed to be replaced? Is that within the scope of your report?
> A. No, it's not within the scope of my assignment here.

[Doc. 140, Exh. A at 119-120.]

This belated attempt by Plaintiff to show some damage that can be attributed to Trane fails. Ivey's testimony is based on an inspection of the coils two years after the acid wash by Peterson and ignores the fact that RTU-1 continued to function without repair for eight months after he said it needed to be replaced. The opinion of Ivey is also contrary to the opinions of Plaintiff's other expert witnesses and the fact testimony of Plaintiff's facility manager (Carrillo) and facility representative (Wales).

For these reasons the Court concludes that Ivey's opinion is not supported by the evidence and is therefore unreliable and does not create an issue of fact. The Court further concludes that Plaintiff has failed to meet its burden of proving damages related to RTU-1 with reasonable certainty other than the cost of the acid wash. *Sandoval v. Baker Hughes Oilfield Ops., Inc.*, 146 N.M. 853, 860, 215 P.3d 791, 798 (Ct. App. 2009).

The Court would also note that Plaintiff has not requested that the Court reconsider its Ruling on Peterson's Motion for Partial Summary Judgment under Federal Rule of Civil Procedure 60. Therefore the Court's Memorandum Opinion and Order [Doc. 107] filed November 24, 2010, concluding there is no evidence to support a damage claim as to RTU-1 remains the law of the case.

<u>Failure to oversee</u>.

The second issue is whether Plaintiff can present evidence to the jury on a claim of negligence against Trane. What is disputed is whether Plaintiff can submit evidence that Trane failed to oversee Peterson's acid cleaning and thus was negligent. Plaintiff asserts that this claim was addressed in the Complaint by alleging that "Trane and Peterson breached that duty by failing to exercise ordinary and reasonable care and prudence while performing acid cleaning services at [Plaintiff's] property, and to take the usual, ordinary measures a prudent, reasonable person would

take regarding the same." [Doc. 1 at ¶46.] This allegation relates solely to the acid cleaning performed by Peterson. It does not articulate an independent claim against Trane for failure to oversee the acid cleaning. Plaintiff also contends that Trane was on notice of this claim because Trane indicated in the Status Report that "Trane further contends that it was not negligent in performing any actions and was not negligent in failing or omitting to act when it had a duty to act." [Doc. 30 at 4.] This statement is a general denial of any negligence and does not support Plaintiff's assertion that Trane was on notice of a negligence claim for failure to oversee.

In addition, in response to specific interrogatories from Trane, Plaintiff stated that the only claims of negligence against Trane was that "Trane was negligent in its supervision of one of its contractors" and that Plaintitff "is not currently aware of any documents that evidence that Trane was negligent independent of the negligent acts of Peterson." [Doc. 146 at 6.] The evidence before the Court is that the Plaintiff has not supplemented these responses and it is too late to do so at this time.

<u>Vicarious liability</u>.

Plaintiff is asserting that Peterson was hired as Trane's subcontractor. [Doc. 44 at 3.] Thus, Plaintiff claims Trane is vicariously liable for the actions of Peterson. Plaintiff cannot bring this cause of action under New Mexico law. An employer of a subcontractor is not liable for the negligence of the subcontractor. "[A]n employer of an independent contractor is not responsible for the negligence of the independent contractor or its employees." *Valdez v. Yates Petroleum,* 2007-NMCA-038, 141 N.M. 381, 383; UJI 13-404, NMSA 1978. There are exceptions to this principle if the activity was inherently dangerous or if the duty arises out of a special relationship to the public or the particular plaintiff. *Id.* The exceptions do not apply in this case. Therefore, Plaintiff cannot establish under the facts of this case that Trane had an independent duty to oversee or assist in the

work performed by Peterson.  If the Plaintiff proves Peterson was an independent contractor as it claims, Trane had no duty to supervise Peterson's work.

For all the foregoing reasons, the Court finds that the only claim that Plaintiff may assert against Trane is for breach of contract for failure to monitor and maintain RTU-1 and RTU-2 and the damages as to RTU-1 are limited to the cost of the acid wash.

**IT IS THEREFORE ORDERED** the sole claim that Plaintiff may assert against Trane at trial is for breach of contract for failure to monitor and maintain RTU-1 and RTU-2 and the damages as to RTU-1 are limited to the cost of the acid wash.

_____
**ALAN C. TORGERSON**
**UNITED STATES MAGISTRATE JUDGE**